ALBANY,
Oct. 1827.

*R. N. Morrison,* contra.

Ex parte
Peru Iron Co.

*Curia.*  The motion is denied.

Motion denied, with costs.

---

[*540]                    *Ex parte* THE PERU IRON COMPANY.

Where a corporation has a general power to purchase real estate, but is restrained by a proviso that it shall purchase only for corporate purposes, and it buys land at sheriff's sale, the intendment is, that the purchase is within the power of the corporation, and the party contesting its capacity must show that it is within the proviso.

*E. g.*  The Peru Iron Company, incorporated by the statute, (sess. 47, ch. 263.)

A judgment of more than 10 years standing, its lien as to *bona fide* purchasers and jurors judgments having expired within the act of 1813, concerning judgments and executions, (1 L. L. 500, s. 1,) ranks, in effect, as a. judgment junior to later judgments; and may redeem from a sale under them, according to the statute, (sess. 43, ch. 184.)

It continues a lien as to the judgment debtor and his heirs.

Under the act, (sess. 43, ch. 184, s. 3,) a senior judgment creditor may redeem from a sale upon a junior judgment.

A purchaser of land at, or one who redeems from a sheriff's sale upon a junior judgment, or upon a judgment whose lien has expired by the lapse of 10 years, acquires all the interest of the judgment debtor; becomes, in effect, his grantee; and may redeem as such, within 12 months after a sheriff's sale upon a senior judgment.

A sale of land upon execution does not carry a title, but only a lien, till after 15 months.

One who acquires title to the land of a judgment debtor by purchase, at a sheriff's sale, being considered a grantee; on his redeeming within 12 months from a sale upon a senior judgment, the latter sale becomes void.

*Semble,* that one having purchased land at sheriff's sale, acquires, at first, a mere lien, which he may release or discharge, without the consent of junior judgment creditors.

A junior judgment creditor pays a purchaser under a senior judgment which he owns, his purchase money, with 10 per cent.; and takes an acknowledgment of the payment, an assignment of the judgment, and all the purchaser's interest in the land, with an order on the sheriff to convey to the person paying.  *Held,* that the person paying is to be considered a redeeming creditor; not a mere assignee.

Where one comes to redeem land sold on execution, from one who has before redeemed; and the latter claims to have an increased payment to him as assignee of a judgment in virtue of which he redeemed, he must furnish proof of his right to such judgment; and it is not enough to furnish a mere memorandum, and give notice of the assignment.

Though a judgment creditor has once redeemed upon his judgment, and taken a title, it is not a satisfaction; and he may redeem again in virtue of the same judgment; especially from a sale on a judgment, senior to his own and the one from which he first redeemed.

A tender by one judgment creditor to another, does not discharge the lien of the latter.

Where several judgments are of more than 10 years' standing, they rank in relation to one another according to their actual priority of date, the same as if the act, (1 R. L. 500, s. 1,) had never been passed.

A short payment, on attempting to redeem, is a fatal omission, and renders the redemption void; though it be by mistake of the sheriff to whom the money is paid, and he assume upon himself to make it up to the purchaser from whom the redemption is sought to be made.

manding the sheriff of that county to convey the lands described in those deeds, to or for the benefit of the relators. Also, that Luther, late sheriff of Clinton county, convey certain lands in that county, to or for the benefit of the relators, &c.

The lands in Essex, are lots No. 73, 74, 123, 159, 160 and 188, in Maule's patent; and the Clinton lands are lots No. 165, 197, 201, 205 and 206, in the same patent.

All these lots belonged to Joseph Winter in fee; when the following judgments were obtained against him in this court:

*I. A judgment by Suydam & Wyckoff, for $6,922 67, docketed May 9th, 1812; revived by *sci. fa.* against Winter's heirs, with $109 55 costs against Jas. Winter, one of the heirs, who appeared and made defense. Judgment of revival, docketed August 8th, 1823. This last judgment was, that the plaintiffs should have execution of the lands of which the original defendant, Joseph Winter, was seized at the time of that judgment, or ever after; and which his heirs had by hereditary descent from him.

[*541]

II. By one Payson, for $2,062 62; docketed September 26th, 1812; revived in like manner against the heirs; and the judgment of revival docketed March 19th, 1825.

III. By the same Payson, for $1,024 82; docketed January 10th, 1812.

IV. By one Kingsley, for $127 10; docketed August 29th, 1817.

These four judgments belonged to the relators.

V. A judgment in favor of Eleazer Cohen, for $2,004 07; decketed February 10th, 1816; and judgment of revival on *sci. fa.* against the heirs, docketed in March, 1825. This judgment was assigned to Daniel Cady.

VI. A judgment in favor of Vechio and Vechio, for $415 86; docketed January 10th, 1812; and assigned to J. H. Douglass.

VII. A judgment in favor of Webbers, for $61 86; docketed December 27th, 1819; and assigned to Isaac Finch.

The relators, being assignees of the two first judgments,

ALBANY,
Oct. 1827.

Ex parte
Peru Iron Co.

caused writs of *fi. fa.* to be issued upon them; and on the 29th of January, 1825, caused the Clinton lands to be sold under the Suydam & Wyckoff judgment, by Luther, late sheriff of Clinton. And on the 3d of August, 1825, they, in like manner, caused the Essex lands to be sold by Kirby, sheriff of Essex, under the Payson judgment. The whole were purchased for the relators, by their agent, one Aikin.

These writs of *fi. fa.* were against the heirs; and the *fi. fa.* on the first judgment, (in favor of Suydam & Wyckoff,)

[*542]

*commanded the sheriff to levy the judgment, of the land of which the heirs were seized by inheritance from Winter, at or after the revival of that judgment; and added, being lands and tenements of which Winter was seized, on the day of the original judgment, or ever afterwards.

Then Cady, being assignee of the 5th judgment, (the Cohen judgment,) caused two several writs of *fi. fa.* to issue; one to the sheriff of Clinton, and one to the sheriff of Essex. On the first, he caused to be sold the Clinton lands, November 3d, 1825; and on the last, the Essex lands, September 10th, 1825, excepting lots 159 and 188; himself becoming the purchaser of the whole.

The lien of the relators' judgments, having expired as to Cady's, by lapse of time, he would thus have acquired title to the whole, except lots 159 and 188; and the relators would have acquired title to these, had it not been for subsequent transactions between the various judgment creditors of Winter.

On the 29th of April, 1826, Finch, then assignee of the 7th (Webber's) judgment, redeemed the Clinton lots No. 165 and 197, from the sale on the first judgment, by paying the proper sum to, and taking a deed from Luther, sheriff. But the relators refused to ratify this redemption by receiving the money so paid.

Then Finch, in order to secure lot No. 197 at all events, on the 26th of September, 1826, (within 12 months from the sale of that lot to Cady,) paid Cady his bid for that lot, with 10 per cent., &c.; taking Cady's certificate under seal, that Finch, (styled in the certificate, owner of the lot,) had

paid that sum. And Cady farther ·certified, that he thereby relinquished his purchase of this lot to Finch; and discharged and released it from the effect of· the purchase.·

Afterwards, on the 18th of December, 1826, Cady certified that he had received of the relators his purchase money, with 10 per cent., and assigned all his interest in the Cohen judgment, and in the other lots as purchaser, to the relators, expressly excepting lot 197.

Then there commenced a struggle as to all the lots, both [*543] in Clinton and Essex, between the relators on the one hand, · and Finch & Douglass on the other.

*On the 2d and 3d of February, 1827, the relators sought to redeem lots 165 and 197, by paying to sheriff Luther the amount of Cady's bid, and the amount of Finch's judgment, (the 7th,) so as to take away all ability from him to redeem over. Afterwards, on the same 3d of February, Finch & Douglass, severally, under their respective judgments, by their agent, Mr. Tomlinson, sought to redeem of Luther lots 165, 201, 205 and 206, in Clinton, by paying the Cady bids with 10 per cent.; but nothing was paid or tendered by them on the claim of the relators as prior redeeming creditors. Finch stood upon his rights as to 197 ; and no offer was made to redeem this by him or Douglass. Sheriff Luther gave a deed of lots 201, 205 and 206, to Aikin, under his purchase ; but refused to give a deed to him or the company under the Cady purchase.

As to the Essex lands. On the 2d of November, 1826, Douglass redeemed, by payment to sheriff Kirby, lots 123, 160, 159 and 188, from the sale to the relators; and on the 10th of December, he redeemed lots 123 and 160 from the sale to Cady ; and attempted to redeem lots 73 and 74 from the sale to Cady. The sum paid to the sheriff on account of the two last lots was short of the bids for them. The amount, however, accorded with Kirby's (the sheriff's) memorandum of the bids, and the information which he gave Douglass; and it was understood between them, that Kirby was to pay any deficiency to the purchaser. This he had ready accordingly, to pay to the agent of the rela-

ALBANY,
Oct. 1827.

Ex parte
Peru Iron Co.

tors, who refused to receive any of the money paid by way of redemption. Douglass, when he made the attempt to redeem, offered Kirby to pay more ; but was prevented by Kirby's offer to correct any error in the payment.

Sheriff Kirby gave deeds to Douglas for all the Essex lots. He had before given deeds to the relators, for lots 73 and 74, on the sale to them upon their own *fi. fa.*

Farther particulars will be found stated in the opinion of the court.

[*544]

*H. Bleecker*, for the motion. 1. An unrevived judgment of more than 10 years standing, does not constitute such a lien as to enable a judgment creditor to redeem under it. The redemption under the Vechio judgment was, therefore, void. We are protected by the statute concerning judgments and executions. (1 R. L. 500.) The Vechio judgment had not only ceased to be a lien by its age ; but we had purchased *bona fide.* Any person acquiring title, whether by a deed directly from the judgment debtor, or by *fi. fa.* and sale upon a judgment, is a purchaser. The statute declares that after ten years, all judgments shall cease to be liens both as to subsequent incumbrancers, and *bona fide* purchasers. In one or the other view we claim to be protected.

2. After payment of the Webber judgment on the 3d of February, 1827, no redemption could be made under it. Finch's claim depending on this, therefore, fails.

3. The act under which these redemptions are sought, (sess. 43, ch. 184, p. 167,) was intended for the benefit of junior judgment creditors. One holding a prior judgment, cannot redeem from a sale made under a younger one. The Webber judgment under which Finch sought to redeem lots 165 and 197, was senior to the Suydam & Wickoff judgment under which the sale was made. The latter judgment dates its lien only from the 8th of August, 1823, when the judgment of revival was docketed. It then became a new judgment. Under the statute, the junior judgment holds subject to the senior, which is not affected by a sale upon the younger. The senior judgment creditor

should be put to his sale upon which he may acquire a title paramount. The contrary would lead to very great confusion. Suppose three judgments at different dates. The youngest sells; the eldest redeems. The middle judgment creditor must, under the 3d section, (p. 198,) pay not only the judgment older, but the one younger than his own; and still he acquires a title under the junior judgment only.

Upon the principle for which we contend, the sale to Aikin was subverted by the sale to Cady, under the Cohen *judgment, still senior; and the lands were no longer the subject of redemption except from Cady. The Aikin purchase no longer subsisted for the purpose of redemption. The assignment to the company brought them into Cady's shoes, as to the whole of his purchase except 197. That lot they must acquire by redemption.

No matter under what particular judgment they redeemed. A right under all or any of their judgments is enough.

Finch, in making the payment to Cady, must be considered as a redeeming creditor; from whom we had a right to redeem over, which we have done. If Finch is not to be viewed in this light, but as the assignee of Cady, then we may certainly redeem, as we might have done from Cady. Finch succeeded to all Cady's rights and liabilities.

*J. V. Henry*, (same side,) who was to reply, gave notice that he should rely on the following cases: *Roselcrans* v. *Hughson*, (1 Cowen, 428;) *Matter of Van Rensselaer* v. *The Sheriff of Albany*, (1 Cowen, 501;) *Matter of Hurd* v. *Magee, Sheriff of Steuben*, (3 Cowen, 35;) *Matter of Erwin* v. *Schriver* (19 John. 379;) *Ex parte Lawrence*, (4 Cowen, 417;) and *Bissell* v. *Payn*, (20 John. 3.)

*D. Cady*, contra. The company have no right to urge against Finch's redemption, that his judgment was a better lien than theirs. He might waive his advantage; and concede the preference to the company. By the act of redeeming he did so. He consented that their judgment

ALBANY,
Oct. 1827.
Ex parte
Peru Iron Co.

[*545]

should be considered a lien from the 9th of May, 1812, when it was docketed. His right to redeem is within the words of the act, (sess. 43, ch. 184, s. 3,) which gives it to any one whose judgment is a lien. (1 Cowen, 459.) To take a matter which is within the letter of a statute, out of its equity, a very strong case should be shown. (6 Bac. Abr. 386.)

The company have no right to allege that their sale was defeated by the sale under the Cohen judgment; and that so, Finch cannot redeem. Finch claims under them, in virtue of their own sale; and they are responsible for the [*546] *goodness of his title. If this be defeated, they are liable to refund; and a remedy is given by statute. (1 R. L. 502, 504, s. 11.) The company professed to sell all the estate of which Joseph Winter was seized, on the 9th of May, 1812. They are not at liberty to say he had no estate on that day; or that his estate was subject to a judgment obtained 7 years afterwards. The form of the execution which they were entitled to is given by the statute, (1 R. L. 502.)

But Finch's sale was not defeated by that under the Cohen judgment. As to lot 197, it was annulled within 12 months after the sale; and no title ever has passed, or ever can pass under the sale. Finch redeemed as purchaser under the 2d section of the statute, (sess. 43, ch, 184.) Before that time, the right of a judgment creditor to redeem does not attach. (*Van Rensselaer* v. *The Sheriff of Albany*, 1 Cowen, 448.) The statute has imposed no restraint as to the manner in which the judgment or sale may be discharged or abandoned for the benefit of the debtor, or the owner of the land. When the company undertook to redeem lot 197, what rights had Cady which could be transferred to them?

But if the sale under the Cohen judgment was not annulled, still the company had no judgment which was a lien on the land as against Finch. He was a *bona fide* purchaser, within the meaning of the act of 1813, (1 R. L. 500;) and protected against all judgments more than 10 years old. The sale by the company destroyed their lien

as against all judgments holden by them, whether older or younger than that upon which they sold, and under which Finch redeemed. (8 John. 333 ; 10 John. 482 ; 4 Cowen, 133.)

But the company have not the capacity to purchase lands, without showing that such purchase is necessary to carry into effect the purposes of the corporation. (Act of Incorporation, 11th November, 1824, sess. 47, ch. 263, § 1, p. 323.) Such is the power given to the company; and to which they must be strictly confined. (15 John. 383 ; 2 Cowen, 664, 668, 678, 700.)

*Talcott, (attorney general,) same side. It cannot be denied, that although Douglass' judgment was more than 10 years old, it was a lien as against the judgment debtor and his heirs. Thus Douglass' right to redeem is within the letter of the act, (sess. 43, ch. 184, s. 3.) It is also within the equity of that statute. The only way to take it out of the equity, is by calling to aid the statute, (1 R. L. 500, s. 1,) and showing that a purchaser under a *fi. fa.* upon a senior judgment, before he obtains a deed, is a *bona fide* purchaser within the latter act, and therefore not to be affected. But he is not a purchaser within the meaning of that act. He acquires no title either in law or equity; but only a mere lien. The statute, (1 R. L. 500, s. 1,) by declaring that a judgment of more than 10 years shall be no lien as to subsequent purchasers or incumbrancers, means no more than that, in effect, it shall become the junior judgment. The object was to prevent prejudice to subsequent purchasers and incumbrancers by ancient liens; and the remedy of the statute is fully satisfied by considering it a junior judgment. To warrant a redemption, it is not necessary that the creditor redeeming should have a lien valid as against every one. Require this; and a junior judgment creditor never could redeem. It has been holden by this court, that a judgment entered even after the sale on a senior judgment, may redeem. (*Van Rensselaer* v. *The Sheriff of Albany*, 1 Cowen, 511.) These remarks apply to Douglass' redemption of lots 73, 74, 123, 159, 160, and 188.

True, as to 73 and 74, Douglass made a short payment:

[*547]

but he did what was equivalent to a full one. He offered the sheriff a full payment, which was declined; and it was agreed between them, that if there was any mistake, the sheriff should make it good; which he offered to do to the agent of the relators. A sheriff may sell without receiving the money. (9 John. 96, 99.)

Finch and Douglass both sought to redeem lots 201, 205 and 206 in Clinton: Douglass, under his judgment, which [*548] we have already considered as a junior judgment; *and Finch, upon his judgment of December 27th, 1819, upon which he had made several previous redemptions.

The tender of the money by the company upon this latter judgment, could not avail them. They had no right to make the tender. This right was personal to the party in the judgment, and must have been made by him, or some one by his directions. If it was not personal, at least, the right was confined to some one who was privy to the defendant. (5 Bac. Abr. 3; 6 John. 37, 38.) The utmost the relators could do, was to redeem. This they did not attempt as to the three lots we are now considering.

Again; Finch had not only a right as creditor; but also a right to redeem. He was about exercising that right, which was a vested one. The relators could not deprive him of it by a tender.

Another decisive objection to the attempt of the company to redeem on the 3rd of February, 1827, is, that evidence of the judgments upon which they sought to redeem was demanded by Finch's agent; and none was given. The relators claimed as assignees; and the settled practice of this court is, that, if requested, some evidence of such a claim must be given at the time of redemption.

*J. V. Henry*, in reply. The company had a general capacity to purchase; and the only limitation is by proviso. The general rule is, that they may hold. If, in fact, they are within the exception, it lies with the opposite party to show this. We need not negative the proviso; but the opposite party must bring us within it. No one has a right to complain. Our purchase or redemption does not pre-

clude any person having a right from redeeming over.
This is a mere mode of paying debts; not of purchasing
land. Because a purchase may be the result of a certain
mode of enforcing payment, that is not to preclude us from
using it. But our capacity cannot be tried on this motion.
Suppose a purchase by an infant or *feme covert*, would the
court determine the capacity on motion? Or would they
not leave this to be tried after the conveyance executed in
*the regular course of a suit at law? The apparent, not       [*549]
the actual right, is now in question. The matter does not
become *res judicata*, by any order which this court can
make. They will look merely to the duty of the sheriff;
and compel him to act up to it. It is not for him to inter-
pose against the capacity of the purchaser. He has received
his money from one competent to pay. This is enough for
his purpose; and his duty is plain. He is bound by his
certificate.

But if the capacity may here be drawn in question, and
the *onus* lies with us, is it not discharged? The company
may purchase lands necessary for corporate purposes. To
this end they may acquire them by any mode of convey-
ance. These lands may be necessary on account of their
iron ore, and the wood upon them. The court will notice
judicially that both are necessary for this company; for
they have a charter unlimited in point of time, which is a
public statute. The court cannot help seeing that in the
one or the other point of view, these lands are necessary,
or, which is the same thing, will become so, directly for the
purpose of the company. Beside; the lots may afford water
power for the use of the company. Surely we are not bound
to show all these things affirmatively, to entitle ourselves
to enforce an incumbrance on land.

But we can be restrained within the limits of the pro-
viso, only by information at the suit of the people. If we
have transgressed, it is a misuser, which cannot be tried in
this collateral way.

We take it for granted that Douglass had no right to
redeem. The statute giving a right to redeem must be
construed by itself. How can Douglass be said to have a

lien on the land, when it is as much open to transfer as if the judgment had never been obtained? It is conceded that it might be defeated by a sale *bona fide*, or a judgment. As a lien, then, it is certainly nothing. A lien implies a right to protection against both sales and incumbrances.

The Suydam & Wyckoff judgment was gone. It was revived by *sci. fa.*; but we agree that this could not give *it a preference. It merely entitled us to sell as junior judgment creditors, whose lien ran from the time of the revival in 1823. Finch was a senior creditor coming to redeem from a purchase under our junior lien. This he could not do; and we accordingly refused to receive his money. We ask, with confidence, can a senior judgment creditor redeem? This court has held that redemption must go in chronological order. Is it not incongruous, to say that a man shall redeem what he cannot lose? Redemption implies an act of saving something which would otherwise be lost. Under this statute, the acts of redemption must go on in a descending series. The fallacy is, in saying that all judgments being a lien may redeem. This is incorrect. There is a qualification of the word lien. There must not only be a lien; but there must be something about it which entitles to a redemption. This quality is essential.

[*550]

The company then succeed to the rights of Cady by their assignment from him, except as to lot 197. Neither Douglass nor Finch could redeem over; the former because his lien had expired, the latter because he was senior creditor. Finch, then, must have taken of Cady, not as grantee of the defendant. He did not purchase of the defendant originally; but attempted a redemption in hostility to him, which failed. His judgment is paid up, or the sum tendered; and then the company redeem over, from the sale to Cady, lot 197. That sale remained in full force, notwithstanding the transaction between him and Finch. If that was anything, it was an assignment of Cady's right to Finch. The company's right to redeem was, therefore, perfect. Cady might have given up his lien to the heirs; but he did not do it. He put Finch in his own place. He

could give Finch no absolute right of property. It was an act of substitution; and the only effect was, that if no one redeemed from Finch he would take title.

Again; there was no offer to pay the Kingsley judgment. That was still subsisting; and notice of it was given. *Nor was there any offer to pay our Payson judgment, of which they also had notice.

[*551]

*Curia*, per SAVAGE, Ch. J. The relators contend,

1. That Douglass could not redeem, because his judgment was of more than 10 years standing; and had therefore ceased to be a lien.

2. That no redemption could be made by Finch from the Cady sale after his (F's) judgment had been paid or the amount tendered; and again,

3. That his judgment, being senior to that on which the relators sold, he could not redeem 165 and 197 from the sales to them.

4. That Finch, in paying Cady, was a redeeming creditor; and the relators had a right to redeem from him: or,

5. If Finch was an assignee of Cady, then the relators might redeem from him.

A preliminary objection to this motion was taken, that the relators, being a corporation, have no right to claim deeds, without first showing that this is necessary for their corporate purposes.

Their act of incorporation, (sess. 47, ch. 263, s. 1, p. 323,) authorizes them to hold lands necessary for manufacturing operations. This preliminary question must, therefore, depend on evidence; which seems to be in favor of the company. This is the first time we hear of the objection. Both Douglass and Finch, who now raise it, had treated the company as valid purchasers in the first instance; and again, as holding the interest of Cady, by the several attempts which they made to redeem. There is no pretence that they acted in ignorance that the company were seeking to acquire these lands for themselves; and as to a portion of the lots, it appears affirmatively, that they had full knowledge of that fact. Yet the right of the company

was not questioned. It was affirmed, and titles claimed and taken under it. These lands may very well be necessary, as furnishing iron ore and coal; and we cannot intend, especially under the circumstances of this case, that their acquisition is entirely without the object *of the incorporation. If the right of the company had not been acknowledged, it is, at least, doubtful whether they should be put to prove in the first instance, not only a formal title, but that the land is necessary for corporate use. However this may be in relation to other corporate companies, it cannot be so with one created for purposes which imply the necessity of owning or using a considerable real estate. They would have an indefinite right to purchase, if not restrained by their charter. This restraint is imposed by a proviso. It is a rule in pleading, that where a statute uses general terms, it is enough for a party to bring himself within those terms; and if the opposite party will avail himself of a proviso, he must show that his adversary's case is within it. The *onus* lies on him; and the reason of the rule would seem to reach the present case.[1]

The questions raised, therefore, will be considered as if the relators were a natural person, with full capacity to take real estate.

On the merits, these motions derive their intricacy from blending together several distinct matters. I will endeavor to separate them.

The motions involve the title to five lots of land in Clinton county, and six in Essex county.

First, of the lands in Clinton. The relators, under the Suydam and Wyckoff judgment, purchased at sheriff's sale, January 29th, 1825, the Clinton lands, being lots 165, 197, 201, 205, and 206, in Maule's patent.

On the 29th of April, 1826, Finch redeemed lots 165 and 197, as assignee of the Webber judgment; and took a deed from the sheriff of Clinton.

The relators never received the money paid by Finch; but contested his right to redeem. The question raised, on

[1] See Chitty's Pleading, vol. 1, pp. 223, 309, 334.

this part of the case, is, whether a senior judgment creditor can redeem from a sale under a junior judgment. The facts present the question. They are these: The Suydam and Wyckoff judgment was docketed May 9th, 1812; and was revived by *scire facias*, August 8th, 1823. The Webber judgment was docketed December *27th, 1819. The relators contend that their judgment is the junior one; and that a senior judgment cannot redeem from a junior; but must sell; and, consequently, the junior judgment may pay off the senior.

[*553]

It is certain that the Suydam and Wyckoff judgment is junior; its lien having expired as to *bona fide* purchasers and subsequent incumbrancers. The record of revival is younger; but that creates no new lien except for the costs. The effect of it is merely to make the execution regular; but not to change the nature of the lien as to the judgment itself.

The words of the act, (sess. 43, ch. 184, s. 3,) are, that it shall be lawful for any creditor, who shall have a judgment which shall be a lien on the real estate of the defendant, to redeem, &c. This is broad enough to embrace every judgment creditor, whose judgment is a lien on the land of the defendant. It is true, that it is not necessary, for the security of the senior judgment, to redeem; because a sale under a junior judgment does not prevent a subsequent sale under the senior. But all judgment creditors are included within the terms used by the legislature. Their object undoubtedly was, to prevent a sacrifice of the defendant's property; and afford an opportunity for all the creditors to bid upon each other, without disturbing the priority of liens; and it seems to me the intention of the legislature will be best promoted, by giving a liberal construction to the act. Even a literal construction, however, will give the benefit of the action to every creditor whose judgment is a lien on the defendant's property. That both these judgments are liens, seemed admitted by the parties. No question of that kind is raised.

Assuming, then, that the Webber judgment, although senior, has a right to redeem, then Finch's redemption was

regular; and so much of the motion as requires his deed under this sale, to be surrendered up to be cancelled, must de denied.

[*554] Finch then became seized of all the rights of Winter, the defendant in the judgments. He was, in effect, *Winter's grantee. He possessed all the title which could be given by virtue of a sale under the Suydam and Wyckoff judgment.

Subsequent, however, to the sale under the Suydam and Wyckoff judgment, (November 3d, 1825,) another sale was made under the Cohen judgment, which was the oldest lien among the seven judgments. For though three of those judgments were docketed in 1812; yet, ten years having elapsed since the docketing, they must necessarily be postponed to all others docketed within ten years anterior to the sale. By the act of 1813, (1 R. L. 500, s. 1,) no judgment shall remain a lien on any real estate, as against *bona fide* purchasers or subsequent incumbrancers, after ten years from the time of docketing. But as against the defendant in the judgment, the lien remains the same as before the act. It continues as against the defendant and his heirs, until payment will be presumed from lapse of time. A judgment more than ten years old may be a lien on the "real estate of the defendant," in the language of the act of 1820; and therefore is entitled to redeem. Such a judgment, however, is not a prior lien to those within the ten years; and must, as to such judgment, be considered junior.

The Cohen judgment was docketed February 10th, 1816; and was, therefore, in legal contemplation, the elder, or more properly the better lien. At the sale under this judgment, on the 3rd of November, 1825, Daniel Cady, Esq., became the purchaser. The same lots were sold at this, as at the preceding sale under the Suydam and Wyckoff judgment, on the 29th of January previous.

It has been settled by this court, that a sale by a sheriff since the act of 1820, does not change the title until consummated by a conveyance; and hence a judgment subsequent to the sale, becomes a lien on the real estate of the

defendant; and entitles the creditor to redeem from the previous sale. On the 29th of April, Finch, by virtue of his redemption under the first sale, became vested with all the estate of Winter; and, in the character of owner, or, in the language of the act, *grantee*, he, on the 26th of September, *1826, within twelve months from the Cohen sale, redeemed lot 197. This sale being upon the older lien, overreached the previous sale; but it was not consummated when Finch received his title under the first sale. If Finch was grantee, then the Cohen sale and the certificate of the sheriff as to 197 became null and void. So Mr. Cady, the purchaser, considered it; for he gave Finch a discharge of that lot from the sale.

[*555]

Here, then, was an end to all further redemption as to lot 197. Even if Finch was not grantee, he had paid the bid upon that lot, and discharged it from that sale. This he had a perfect right to do; and this act could work no prejudice to any subsequent incumbrancer. It was releasing so much from the prior incumbrance; and, of course, if the redemption was invalid, on account of the person making it not being entitled to do so, still the fund was increased, out of which the junior judgments might be paid.

On the 18th of December, 1826, the relators purchased all Mr. Cady's interest in the Cohen judgment, and in the lots sold under that judgment. If they became mere assignees, then they stood in the relation of purchaser, in the same manner as Mr. Cady did before he assigned his interest. They, however, contend that they did not purchase Cady's bid; but redeemed from him as creditors; and it becomes material to inquire in what relation they stood.

Col. Murray, as agent for the relators, they being assignees, as he swears, of the Suydam and Wyckoff judgment, of the two judgments in favor of Payson, and one in favor of Kingsley, paid to Mr. Cady his purchase money, and ten per cent.; taking a written acknowledgment of the payment, and an order on the sheriff to give deeds to the relators of all the lots except 197; and assigning to them

the Cohen judgment, and all his interest in the lots. In my judgment, they are to be considered redeeming credi tors, so far as regards this transaction. Mr. Cady migh have required proof both of the existence of their judg ments, and of their being assignees. Whether he did o not, does not appear. It does appear, however, by th [*556] *affidavit of Col. Murray, that they were assignees of thos judgments; and in that character redeemed from Cady Thus far they proceeded regularly enough on both sides.

On the 2nd of February, 1827, Col. Murray paid to th sheriff of Clinton, $1,463, to redeem lots 165 and 197. A to 165, it is extraordinary that the relators should hav attempted to redeem from themselves. As the facts the stood, they were entitled to a deed by virtue of the tran fer from Cady, whether they were purchasers or redeemin creditors. As to 197, they proceeded on the ground tha Finch redeemed as a judgment creditor, and not as grante The facts already stated, in relation to this part of the cas show, in my judgment, that this lot was placed *hors d combat.* The effort, as to both lots, was, therefore, perfectl futile. It will be recollected that both these lots were r deemed by Finch from the Suydam and Wickoff sale; an he received a deed for them. After obtaining this deed, h sold lot 165 to Douglass in September, 1826.

On the 3d of February, 1827, both parties appeared b fore the sheriff late at night; Murray and Aiken for th relators, with their counsel, on one side; and Finch an Gilson, with their counsel, on the other side. But befor this, and on the same day, Gilson, on the behalf of Dou lass, had left $250 to redeem lot 165. In the evening, l appeared, and demanded a deed, which the sheriff declin giving. About half-past eleven, Murray paid the sheri $100 to satisfy and extinguish the Webber judgment, whic belonged to Finch, as a part of the redemption of 19 Immediately, Finch, Gilson and Mr. Tomlinson, their cou sel, appeared. Mr. Swetland, the counsel on the other sid informed them that the Webber judgment was paid u and that the money was in the sheriff's hands, and lyi on the table. Col. Murray informed them of the arrang

ment with Cady, and Mr. Swetland informed them of the judgment of which the relators were assignees; showing them a memorandum of the assignments, containing the dates and amounts. Mr. Tomlinson examined the memorandum, and handed to the sheriff *a written notice signed by Finch, stating that he was assignee of the Webber judgment. Murray then tendered to Finch another $100, in satisfaction of that judgment, which he refused to receive. Mr. Tomlinson, as counsel for Finch and Douglass, required of Messrs. Murray and Swetland, and of the sheriff, some evidence of the existence of their judgments, and of their right to them. None was offered except the memorandum. This contained the titles, and the sums claimed to be due, as I before mentioned; and, in a note, it was stated that they were assigned to the relators, whose counsel now claimed 5 or 6,000 dollars. Mr. Tomlinson protested against the right of the relators to tender, or the sheriff to receive payment of the Webber judgment. He then stated that, in virtue of the Webber judgment and of the Vechio judgment, he redeemed lots 165, 201, 205 and 206; and paid $450 for that purpose. He handed the sheriff a memorandum, containing the titles and the amount of the judgments; stating that the Webber judgment was assigned to Finch, and the Vechio judgment to Douglass. The sum paid was the amount bid by Cady, with ten per cent. Col. Murray required payment of the judgments assigned to the relators, to which the answer was given, that they had produced no evidence either of the existence of their judgments or the amount, or of the assignments. Mr. Tomlinson states, in his affidavit, that on the Payson judgment about 3,000 acres of land were sold in Essex county; and on the Suydam and Wyckoff judgment about 1,500 acres of land in Clinton county, for a sum nearly the amount of the judgment. Gilson swears that previous to the redemption by Mr. Tomlinson, he demanded to know the amount of liens on the lots; declaring that he was prepared to pay all previous liens; that he asked for exemplifications of the judgments, or certificates from the clerk that there were such judgments.

[*557]

ALBANY,
Oct. 1827.

Ex parte
Peru Iron Co.

[*558]

On these facts, the question arises, who is entitled to a deed, the relators, Finch or Douglass? As to 197, I place it out of the case, on the ground that it was redeemed by the grantee of the defendant. Though if Finch had *acted as a creditor, when he redeemed from Cady, then the relators have done enough to entitle them to a deed under their judgment in favor of Kingsley. My opinion, however, as to that lot, is, that no deed is to be given to any one. As to the other lots, they seem to me to be all in the same condition. They were all sold under the Suydam and Wyckoff judgment. Finch took a deed of 165 and 197; and the relators took deeds of the other three lots under the same sale. That sale was overreached by the Cohen sale and purchase by Mr. Cady; and the relators, as his assignees, or as redeeming creditors from him, are entitled to a deed, unless that right has been divested by the acts of other creditors. Their attempt to redeem 165 and 197, I have already considered as futile and of no effect.

Did, then, either Finch or Douglass obtain a preference? They united, and Mr. Tomlinson for them paid the amount of the Cady bids, and ten per cent.; but no more. If the relators were assignees only of Cady, then enough was done; and Finch and Douglass are entitled to a deed. If however, the relators were redeeming creditors, and furnished evidence of that character, then enough was not done. When evidence was called for, all that was furnished was a memorandum unsigned by any one, and an assertion made by Col. Murray, that the relators were assignees of those judgments. Mr. Tomlinson declares himself ready to discharge any lien which they are entitled to receive. No evidence is produced showing title to any judgment except the direction from Mr. Cady to the sheriff to convey. Then Finch and Douglass are entitled to a deed, if they were judgment creditors having a lien.

First, was the Webber judgment a lien? It was unless the lien had been discharged, either by the redemption under the first sale, or by the tender just before the redemption. As to the first redemption, that cannot be a satisfaction; for although he derived a title under it, it was but

nominal, and like a conveyance from Winter himself. This was not a case of tender. It is like that of *Jackson v. Law*, (5 Cowen, 248,) in which it was decided that a *tender by one judgment creditor to another did not discharge the lien. The Webber judgment, then, was a subsisting lien; and the redemption good.

Was the Vechio judgment a lien? It was docketed January 10th, 1812; and not revived. The first sale was under the Suydam and Wyckoff judgment, which was docketed May 9th, 1812; and revived August 8th, 1823. Both judgments had lost their lien as to junior judgments and *bona fide* purchasers. Which was the prior judgment? If they are to take rank according to their dates, then the first sale was on the junior judgment. If the priority is reversed by lapse of time, then the first sale was under the elder judgment; and the junior, not having redeemed from that sale, lost its lien altogether; and cannot redeem. In my judgment, it comports best with the policy of the act, and the intention of the legislature, to hold that the lien of both had expired as to all concerned, except the defendant and his heirs; and as to them, that the liens, thus qualified, rank as if the act of 1813 had never been passed. If this is correct, then the Vechio judgment was entitled to redeem; and therefore, under either Finch or Douglass, the redemption by Mr. Tomlinson was good.

There is no ground, therefore, for a mandamus to the sheriff of Clinton, to convey 165, 201, 205 and 206, to the relators. Finch or Douglass, or both, are entitled to deeds of those lots as redeeming creditors.

The motion of the relators as to these lands must be denied.

As to the lands in Essex. Lots 73, 74, 123, 159, 160 and 188, were sold by the sheriff of Essex, under the Payson judgment, August 3d, 1825; and purchased by Aikin. On the 2d of November, 1826, Douglass, by virtue of his Vechio judgment, redeemed 160, 159, 123 and 188; and received a deed on the 4th of November, 1826. On the 10th of September, 1825, lots 73, 74, 123 and 160, were sold by the same sheriff under the Cohen judgment; and

purchased by Mr. Cady.    On the 10th of December, 1826, Douglass regularly redeemed 123 and 160; and paid the sheriff the amount which he claimed for the money bid on *73 and 74, and ten per cent.; and after the 15 months had expired, he conveyed the whole to Douglass.   It was agreed between Douglass and the sheriff, that if enough was not paid, the sheriff should pay it; and when Col. Murray called and demanded a deed for the relators, the sheriff had money enough lying on his table, which he was about to offer; but Col. Murray declared he would not take any money on any of the lots sold and redeemed, until he had consulted Mr. Swetland.   The sheriff, in fact, tendered to Col. Murray only $22 50 for both lots; whereas, one sold for $29 10; and the other for $20 90.   The short payment no doubt was a mistake of the sheriff.

The questions arising on this part of the motion are, 1. Is the Vechio judgment a subsisting lien, which will authorize a redemption?  2. If it is, then does the short payment vitiate the redemption as to 73 and 74?   If it does not, then the relators must fail in this part of the motion. If it does, then their motion must be granted as to these two lots.

The first of these questions I have already attempted to answer.   The second has, I think, been decided in the case of *Dickinson* v. *Gilliland*, (1 Cowen, 498.)

The conclusion is, that so much of the motion as requires the sheriff of Essex to convey lots 73 and 74 to the relators, be granted; and the residue denied.

Rule accordingly.